## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **NO. 3:14-CV-02037-B** |
| **472,871.95 IN FUNDS SEIZED FROM** | § | |
| **BANK OF AMERICA ACCOUNT** | § | |
| **ENDING IN 9957,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

### OPPOSED JOINT MOTION TO COMPEL GOVERNMENT TO RELEASE RESTRAINED OR SEIZED PROPERTY FOR WHICH THE GOVERNMENT HAS FAILED TO DEMONSTRATE PROBABLE CAUSE FOR FORFEITURE FILED BY GERALD SHULTS, INDIVIDUALLY AND ON BEHALF OF AMY LYNN, INC., GAS PIPE, INC., AND RIDGLEA COMPLEX MANAGEMENT INC.; AMY LYNN HERRIG AND DAN HERRIG INDIVIDUALLY; and RAPIDS CAMP LODGE, INC. (CLAIMANTS), WITH BRIEF IN SUPPORT

To the Honorable United States District Judge Solis:

**Gerald Shults**, individually and on behalf of **Amy Lynn, Inc**., **Gas Pipe, Inc.**, and

**Ridglea Complex Management Inc.; Amy Lynn Herrig and Dan Herrig, individually;** and

**Rapids Camp Lodge, Inc. ("Claimants")** file this opposed motion to compel the release of

restrained or seized property for which the government has failed to demonstrate probable cause

for forfeiture, with brief in support:

## I.  Table of Contents

I.     Table of Contents ................................................................................................ 2

II.    Table of Authorities ........................................................................................... 3

III.   Background ......................................................................................................... 5

IV.    Argument ............................................................................................................ 8

    1.    Claimants' retirement accounts must be released ..................................... 8

    2.    All Pre-March 2011 funds in Claimants' UBS accounts must be
    released ................................................................................................... 10

        i.    The drug claims are facially insufficient ................................. 11

        ii.   Proceeds of money laundering claim is facially insufficient ................. 12

        iii.  Property 'involved in' money laundering claim is facially
        insufficent ............................................................................. 13

        iv.   The government's allegations of "layering" are without merit ............. 17

    3.    Property purchased with Claimants' UBS lines of credit must be
    released ................................................................................................... 20

        i.    The lines of credit are secured by untainted pre-March 2011
        funds ..................................................................................... 21

        ii.   Claimants' legitimate properties were purchased with the
        untainted lines of credit ......................................................... 23

V.     Prayer ............................................................................................................... 27

VI.    Certificate of Conference ................................................................................. 29

VII.   Certificate of Service ....................................................................................... 29

## II. Table of Authorities

### Cases

*Boggs v. Boggs*, 520 U.S. 833 (1997) ........................................................................ 9

*Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365 (1990) .................................... 9

*United States v. $448,342.85*, 969 F.2d 474 (7th Cir. 1992) .......................................... 14

*United States v. All Funds Distributed to, or on Behalf of, Edward Weiss*, 345 F.3d 49 (2d Cir. 2003) ........................................................................ 9

*United States v. Bornfeld*, 145 F.3d 1123 (10th Cir. 1998) .......................................... 17

*United States v. Certain Accounts*, 795 F. Supp. 391 (S.D. Fla. 1992) ........................................ 15

*United States v. Contents in Account No. 059-644190-69*, 263 F. Supp. 2d 789 (D. Ver. 2003) .................................................................. 14, 17, 18

*United States v. Fernandez*, 559 F.3d 303 (5th Cir. 2009) .......................................... 17

*United States v. Loe*, 49 F. Supp. 2d 514 (E.D. Tex. 1999) .......................................... 15

*United States v. Miles*, 360 F.3d 472 (5th Cir. 2005) .......................................... 17, 20

*United States v. Tencer*, 107 F.3d 1120 (5th Cir. 1997) .......................................... 14, 17

### Statutes

18 U.S.C. § 1956 .................................................................. 12, 14, 17

18 U.S.C. § 1957 ........................................................................ 17

18 U.S.C. § 981 ........................................................................ 6, 12

18 U.S.C. § 983 ........................................................................ 6

21 U.S.C. § 881 ........................................................................ 10, 11

29 U.S.C. § 1056 ........................................................................ 9

### Other Authorities

Stefan D. Cassella, *Establishing Probable Cause For Forfeiture in Federal Money Laundering Cases*, 39 N.Y.L. Sch. L. Rev. 163 (1994) ........................................ 16

### Rules

Supp. Rule Adm. or Mar. Cl. & Asset Forfeiture Actions G (2014) .......................................... 6

U.S.S.G. § 2S1.1 (2001) .......................................................................................................... 18

**Regulations**

26 C.F.R. § 1.401 ...................................................................................................................... 9

### III. Background

1.      This motion seeks the release of restrained or seized property for which the government has failed to demonstrate probable cause for forfeiture.

2.      To justify the continued pretrial restraint of property in a civil forfeiture proceeding that has been seized or restrained *ex parte*, the government must establish probable cause to believe that the property is subject to forfeiture.  Plaintiff has not made such a showing.

3.      In the original complaint filed on June 5, 2014 (ECF 2), plaintiff did not seek the forfeiture of the UBS accounts.  Nor did plaintiff secure a restraining or seizure order with respect to these accounts.  Plaintiff was most likely aware that these accounts primarily contained untainted funds that predated the alleged period of criminal activity asserted in the complaint, and did not believe a plausible forfeiture basis could be asserted.

4.      That did not, however, stop plaintiff from informally restraining these accounts.  According to an arrest warrant issued by the Court three months after the accounts were restrained, "the defendant property...has been 'frozen' by UBS Financial Services under civil seizure warrants..."  *See* ECF 65, filed September 18, 2014.  In other words, plaintiff 'asked' UBS to freeze the accounts without securing any Court authorization, and UBS complied.  At that point, plaintiff had failed to articulate any legal or factual basis for the restraint of Claimants' UBS accounts, and today plaintiff still fails to so articulate.

5.      That informal restraint without any legal or factual showing continued for more than three months.  Claimants could not use a penny of their money for three months even though no Court had authorized the restraint of the funds.

6.      Finally, three months after the accounts were frozen, plaintiff sought to formally restrain the UBS accounts under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  *See* Supp. Rule Adm. or Mar. Cl. & Asset Forfeiture

Actions G(3)(b)(ii) (2014).  Rule G, like the other provisions permitting pretrial asset restraint or seizure, requires the Court to make a finding of probable cause that the property sought to be restrained or seized is actually subject to forfeiture.  *Compare*, *e.g.*, 18 U.S.C. § 981(b) (seizure warrants); 18 U.S.C. § 983(j) (restraining orders).

7.      The statute requires the government to set forth, under oath, a valid legal theory of forfeiture, state the grounds for *in rem* and subject-matter jurisdiction over the property, "identify the statute under which" forfeiture is sought, and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supplemental Rule G(2)(b), (e) & (f).  The burden of proof stays with the government through trial, where "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."  18 U.S.C. § 983(c)(1).

8.      Here, the Warrant of Arrest *in rem* states that the Court's sole basis for finding probable cause to believe that the UBS accounts are subject to forfeiture is set forth only in the amended complaint.  *See* ECF 65 at 2.  No supporting evidentiary material was submitted by plaintiff in seeking the warrant.  *See* Application for Warrant of Arrest *In Rem*, ECF 62 at 2 ("The facts supporting a finding of probable cause to believe the defendant accounts are subject to forfeiture are set forth in the amended complaint").

9.      Accordingly, by plaintiff's own concession, the sufficiency of plaintiff's showing of probable cause is based solely on the legal and factual sufficiency of the amended complaint. Thus, if the amended complaint fails to set forth a sufficient basis to establish that any defendant property is subject to forfeiture to satisfy the probable cause standard, that property *must* be released.

10.     Further, and significantly, because the warrant was obtained without a motion or a hearing, this motion constitutes the first time that the Court is hearing argument on why *any* of Claimants' property, including the UBS accounts, may not be subject to forfeiture.

11.     The purpose of this motion is to isolate and identify the claims in the government's Amended Verified Complaint for Forfeiture *In Rem* (ECF 58) ("amended complaint") that fail to establish probable cause that specific property is subject to forfeiture and request the release of all such properties.

12.     Other claims for which plaintiff's showing is factually insufficient may have to await discovery to resolve questions of fact.   This motion is limited to claims whose insufficiency is evident from the face of the amended complaint.

13.     There are three categories of property with respect to which the amended complaint is insufficient on its face.  First, the amended complaint fails to establish probable cause for forfeiture or restraint of two UBS accounts that are ERISA-qualified employee pension accounts and one personal IRA.  As discussed below, federal law bars the restraint or forfeiture of such accounts.  Accordingly, these accounts must be immediately released.

14.     Second, the amended complaint fails to establish probable cause for forfeiture or restraint with respect to the funds that were in the UBS accounts prior to March 1, 2011. March 1, 2011 is the earliest date set forth in the amended complaint for any allegation of an illegal act giving rise to forfeiture. As demonstrated below, plaintiff has failed to allege a viable theory of forfeiture with respect to such 'preexisting funds' under any of the statutes relied upon in the amended complaint.

15.     Third, the amended complaint fails to establish probable cause for forfeiture or restraint with respect to certain real and personal property purchased with Claimants' UBS lines of credit.  None of these five properties are alleged to have been used to commit any illegal

activity. From their creation in 2010, these lines of credit have been secured by stock accounts created years prior to the alleged period of criminal activity and which have remained untouched since that time. Thus, these purchases made with funds from these lines of credit – which the complaint concedes are all legitimate property used for legitimate purposes – cannot form a basis for forfeiture. Accordingly, as demonstrated below, all of this property must be released as well.

## IV. Argument

### 1. Claimants' retirement accounts must be released

16.    Three of the UBS accounts restrained by plaintiff are exempt by federal law from seizure, restraint or forfeiture: UBS #8402 ("GP Pension Fund"); UBS #4875 ("GP Pension Dividend") and UBS #0852 (Gerald Shults IRA).[1]   In seeking and obtaining the Court's imprimatur on the seizure of these accounts, plaintiff failed to disclose these critical factual and legal issues. Nor is there any acknowledgment in the amended complaint that these are protected retirement accounts. *See* Amended Complaint ¶¶ 303-310. These accounts must be released.

17.    Pension funds and retirement accounts qualified under the Employee Retirement Income Security Program (ERISA) are not "subject to attachment, garnishment, levy, execution or other legal or equitable process." 26 C.F.R. § 1.401(a)–13(b); *see* 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated"). This provision "bespeak[s] a pension law protective policy of special intensity:

---

[1]The amended complaint confuses two of Claimants' UBS accounts, providing additional proof of the overreaching that marks plaintiff's handling of this proceeding. First, plaintiff 'flipped' UBS account #8258 with UBS account #4875. This is no minor error, as it affects the restraint of more than seven million dollars. UBS account #4875 is the GP Pension Dividend account that had a balance of $1,526,068 on the date of seizure and UBS account #8258 is the Gas Pipe Inc. account that had a balance of $5,661,068 on the date of seizure. Thus, the allegations of wrongful transactions in the amended complaint involving these accounts are incorrect. *See* Amended Complaint ¶¶ 324(a)-(g) (erroneously alleging transactions involving UBS account #8258 that actually involved UBS account #4875); *id.* ¶¶ 330, 331(a)-(e), 332 (erroneously alleging transactions involving UBS account #4875 that actually involved UBS account #8258).

Retirement funds shall remain inviolate until retirement." *Boggs v. Boggs*, 520 U.S. 833, 851 (1997).

18.     The courts have made it clear that retirement account funds cannot be accessed even where they are alleged to be involved in criminal activity.  *See, e.g.*, *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990) ("Nor do we think it appropriate to approve any generalized equitable exception – either for employee malfeasance or for criminal misconduct – to ERISA's prohibition on the assignment or alienation of pension benefits. Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task").

19.     Plaintiff's restraint of these "inviolate" accounts epitomizes the prosecutorial overreaching that marks the seizures and restraint in this case.  Notably, this is an issue that, even if resolved in Claimants' favor, "puts no money in their pockets."   What it does is enable Claimants to honor their legal and contractual commitments to their employees to provide them with defined retirement benefits.[2]   These accounts are protected by law and must be released.

---

[2]There is virtually no risk to plaintiff's interests resulting from the release of these accounts. Should the trusts be 'broken,' or should any of the individual Claimants receive retirement benefits during the pendency of this proceeding, plaintiff will be free to seek the restraint and forfeiture of the funds *at that point*, assuming plaintiff can demonstrate that the funds are otherwise subject to restraint and forfeiture. Unless and until that occurs, however, the Court lacks jurisdiction over these accounts.  *See, e.g.*, *United States v. All Funds Distributed to, or on Behalf of, Edward Weiss*, 345 F.3d 49, 57 (2d Cir. 2003) ("until the BR pension plan funds were distributed to the plan beneficiaries, the government could not have made its forfeiture claim successfully.  Ironically, it was the alleged money laundering offense of depositing the tainted funds into an ERISA pension plan that afforded the money protection from outside claims").

### 2.  All Pre-March 2011 funds in Claimants' UBS accounts must be released

20.     In addition to the three UBS pension and retirement accounts discussed above, plaintiff has restrained and seeks to forfeit the entire balances of six other UBS accounts held by various corporate and individual Claimants, comprising every dollar Claimants had at UBS on the date of seizure.  The combined balances of these six nonretirement accounts on the date of seizure was $11,904,167.

21.     However, as plaintiff has acknowledged, on March 1, 2011, the combined balances of three of these accounts was **$7,112,971**.[3]  As plaintiff has also conceded both in the amended complaint and in its response to Claimants' pending motion to release sufficient restrained funds to pay Claimants' federal 2013 corporate income taxes, those pre-March 2011 balances constitute untainted income from undisputedly legitimate sources.

22.     The amended complaint fails to establish probable cause under any valid theory that these preexisting funds are subject to forfeiture.  Thus, they cannot be restrained prior to trial.

23.     The amended complaint asserts four bases to forfeit Claimants' UBS accounts.  Two grounds are asserted under 21 U.S.C. § 881(a)(6), the drug forfeiture statute.  Amended Complaint ¶ 344.  The other two grounds are asserted on a theory of money laundering under 18 U.S.C. § 981(a)(1), the general civil forfeiture statute.  *Id.* ¶¶ 345-46.

24.     None of these four theories establishes probable cause for forfeiture or the continued restraint of the pre-March 2011 balances in Claimants' nonretirement UBS accounts.  Accordingly, these funds must be released.

---

[3]The three accounts in issue are UBS #5092 (3/1/11 balance $1,237,000); UBS #8258 (3/1/11 balance $5,542,406); UBS #6235 (3/1/11 balance $333,565).   The other three UBS nonretirement accounts – UBS #4980, UBS #4596 and UBS #7514 – were all opened in 2012 and thus had no balances as of March 1, 2011.

25.     Plaintiff also represented to this Court in its application for the Arrest Warrant *in Rem* that the UBS accounts were subject to forfeiture under subdivisions (a)(4) and (a)(7) of 21 U.S.C. § 881. ECF 62 at p.2.  As subdivision (4) relates solely to conveyances and subdivision (7) relates solely to real property, plaintiff's representation to the Court – adopted by the Court in the Arrest Warrant – was incorrect, as this Warrant did not restrain any conveyances or real property.  ECF 65 at p.2.  These forfeiture bases are accordingly not addressed on this motion, as they are not asserted in the amended complaint as a basis for forfeiture of any of the UBS accounts.

### i.   The drug claims are facially insufficient

26.     The amended complaint alleges two theories as to why the UBS accounts are subject to forfeiture under 21 U.S.C. § 881(a)(6): that they were "furnished or intended to be furnished . . . in exchange for a controlled substance" and that they are "proceeds traceable to such an exchange . . .."  Amended Complaint ¶ 344 (citing 21 U.S.C. § 881(a)(6)).

27.     The facial insufficiency of these claims is clear.  The amended complaint alleges that the illegal drug-related activity giving rise to forfeiture did not commence until March 1, 2011 at the earliest.[4]  Thus, the balances in the UBS accounts as of that date could not, as a matter of fact and law, be the "proceeds" of an illegal drug transaction.  Simply put, in the light most favorable to the government's theory, the alleged illegal transactions had not yet occurred.

---

[4]While plaintiff also alleges forfeiture claims based on alleged "misbranding" of products, such claims do not arise under the drug forfeiture statute, 18 U.S.C. § 881.  In fact, Congress has not authorized forfeiture for any misbranding crime.  *See, e.g.*, 18 U.S.C. §§ 981(a)(1)(C) (general civil forfeiture statute); 1956(c)(7) (listing criminal statutes constituting "specified unlawful activity" for purposes of forfeiture under section 981).  Plaintiff has attempted to bypass this problem by alleging that the misbranding was part of a fraudulent scheme involving use of the mail or wires under 18 U.S.C. §§ 1341 or 1343, or both, which are forfeiture crimes.  Such allegations renders plaintiff's forfeiture claim based on misbranding suspect.

28.     Similarly, the balances of the UBS accounts could not have been "furnished...in exchange for a controlled substance."  If those funds had been used for that purpose, they would no longer have been in the accounts.

29.     Further, the factual allegations of the amended complaint conclusively establish that the pre-March 2011 balances of Claimants' UBS accounts were neither "furnished [n]or intended to be furnished...in exchange for a controlled substance."

30.     In sum, there is no factual support in the amended complaint or in any other pleading for any allegation that the March 2011 balances in Claimants' UBS accounts were related in any way to the purchase or sale of products containing controlled substance analogues.

### ii.  Proceeds of money laundering claim is facially insufficient

31.     As demonstrated above, the March 2011 balances in Claimants' UBS accounts, as a matter of law and fact, cannot be the proceeds of alleged drug transactions that the amended complaint concedes had not yet even occurred.  Plaintiff's 'proceeds of money laundering' claim suffers from the same facial defect.  *See* Amended Complaint ¶ 346 (citing 18 U.S.C. § 981(a)(1)(C)).

32.     Funds cannot be the proceeds of money laundering that has not yet occurred.  And one cannot launder money from a crime one has not yet committed.  Accordingly, the amended complaint fails to establish probable cause for forfeiture of the March 2011 balances in Claimants' UBS accounts as the alleged "proceeds traceable to an offense constituting 'specified unlawful activity' as defined in 18 U.S.C. § 1956(c)(7)" under 18 U.S.C. § 981(a)(1)(C).  Thus, this theory of forfeiture also fails to provide a basis for the continued restraint of these pre-March 2011 funds.

### iii. Property 'involved in' money laundering claim is facially insufficent

33.    The amended complaint also alleges that Claimants' UBS accounts are subject to forfeiture "pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957," the money laundering statutes. *See* Amended Complaint ¶ 345.

34.    This claim also fails to establish probable cause for forfeiture of the pre-March 2011 funds in Claimants' UBS accounts. The 'factual' allegations purporting to justify this legal conclusion are set forth in the preceding paragraphs addressing the different UBS accounts. After describing each account, plaintiff repeats the same boilerplate allegation taken from the money laundering statute:

> The illegal proceeds deposited into [each] UBS account . . . have been commingled with legally obtained funds . . . [as] part of a money laundering 'layering' scheme . . . to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. (Amended Complaint ¶¶ 307, 310, 313, 317, 336).[5]

35.    The "legally obtained funds" referenced in these allegations of the amended complaint are the pre-March 2011 funds that are the subject of this branch of the instant motion. The alleged "illegal proceeds" are the funds Claimants earned after March 1, 2011 that were deposited into the UBS accounts between March 1, 2011 and the date of the seizure. From these two facts, without more, plaintiff asserts that depositing the post-March 2011 funds into UBS accounts containing pre-March 2011 funds somehow concealed the source of the post-March 2011 deposits.

---

[5]*See* 18 U.S.C. § 1956(a)(1)(B)(i) (imposing criminal sanctions for conducting a "financial transaction which . . . involves the proceeds of specified unlawful activity . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity").

36.     These bare-bones allegations are insufficient to establish probable cause to forfeit property allegedly "involved in" money laundering within the meaning of 18 U.S.C. § 1956(a)(1)(A).

37.     To briefly summarize plaintiff's argument, even though the amended complaint concedes that only about $4 million was deposited into the UBS accounts between March 2011 and the date of seizure, that amount *plus* the more than $7 million in untainted funds that were already in those accounts before the first alleged criminal act occurred should be forfeited as well.

38.     This attempt to turn a $4 million claim into an $11 million forfeiture based on an unduly expansive reading of the "involved in" money laundering provision of section 1956(a)(1)(A) is another instance of the history of abuse of a statute with potentially limitless reach.  Both Congress and the courts have repeatedly recognized the "nearly limitless contagion the government seeks to release into the banking system" in its litigation of money laundering claims and required a substantially greater initial showing under this provision than a mere assertion that allegedly tainted funds were deposited into an account containing concededly untainted funds.  *United States v. Contents in Account No. 059-644190-69*, 263 F. Supp. 2d 789, 799 (D. Ver. 2003).

39.     It is established that "merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture."  *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997).  "[T]he government confiscates the *funds*, not the account... [O]nce we distinguish the money from its container, it also follows that the presence of one illegal dollar in an account does not taint the rest – as if the dollar...were like a drop of ink falling into a glass of water."  *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992) (emphasis in original); *accord United States v. One 1980 Rolls Royce*, 905 F.2d 89, 90 (5th Cir. 1990) ("We

do not believe...that forfeitability spreads like a disease") (citation omitted); *United States v. Loe*, 49 F. Supp. 2d 514, 523 (E.D. Tex. 1999) ("forfeitability does not spread like a disease from one infected dollar to the entire interest in the property"); *United States v. Certain Accounts*, 795 F. Supp. 391 (S.D. Fla. 1992) ("Like a contagious disease, each direct account could contaminate any account that had dealings with it.  The indirect accounts could then conceivably pass on the infestation to other accounts and so forth *ad infinitum*.  The outer limits of this theory would be bounded only by Plaintiff's imagination").

40.     Congress affirmed this principle with the passage of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA).  Congress recognized the abuse of statutes permitting forfeiture of untainted property "involved in" money laundering.  As a result, in enacting the new civil forfeiture procedural statute, Congress raised the government's burden of proof, affirmed that the ultimate burden is on the government to prove forfeiture and provided that in "any civil forfeiture" action, "if the Government's theory of forfeiture is that the property was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3).

41.     As Chairman of the House Judiciary Committee and the lead sponsor of CAFRA (H.R. 1658), Representative Henry Hyde agreed with *Tencer* and other cases regarding money laundering:

> [T]he mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture . . . [T]he government [must] demonstrate[] that the . . . [owner] pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme.
>
> Under H.R. 1658's substantial connection test, in order for an entire bank account composed of both tainted and untainted funds to be forfeitable, a primary purpose of its establishment or maintenance must be to disguise a money laundering scheme.  This rule should also apply when the government seeks to forfeit an entire business because tainted funds were laundered in a firm bank account.  For the business to be forfeitable, a primary purpose for the establishment or

maintenance of the entire business must be to disguise a money laundering scheme.

146 Cong. Rec. H2041 (daily ed. Apr. 11, 2000).[6]

42.     Here, other than the bare-bones allegation repeated above that Claimants deposited post-March 2011 funds into UBS accounts containing pre-March 2011 funds, plaintiff does not explain how such 'commingling' was intended to conceal illegal proceeds.  As a person no less formidable than the former and long-time head of the Department of Justice's Asset Forfeiture and Money Laundering Section has written, a facilitation theory will fail "when the government is unable to explain how the 'clean' funds or property made the money laundering any easier to commit or any more difficult to discover."  Stefan D. Cassella, *Establishing Probable Cause For Forfeiture in Federal Money Laundering Cases*, 39 N.Y.L. Sch. L. Rev. 163, 182 (1994); *see id*. at 187-188 ("in cases in which the underlying money laundering offense includes *mens rea* elements, the government's probable cause evidence must establish those elements as well as the purely factual requirements").

43.     In sum, the amended complaint fails to make a *prima facie* showing that the commingling of post-March 2011 and pre-March 2011 funds "in any way contributed to, or facilitated...money laundering.   The innocent funds must have been used in some way to hide the nature of the tainted funds...[I]f the tracing requirement in § 981 is to be given any effect – as indeed it must  – then the government is required to demonstrate something more than the fact of

_____

[6]Chairman Hyde's admonition that, to forfeit all assets of a business, the government must prove that the entire business was established or maintained to disguise a money laundering scheme is particularly appropriate here.  Plaintiff seeks to forfeit every dollar in every one of Claimants' accounts, yet concedes that Claimants' businesses are legitimate by permitting them to continue in operation. Clearly, the government does not even suggest that the purpose of Claimants' business is to disguise a money laundering scheme.  Yet the scope of the forfeiture sought is consistent with such a broad-based claim.  This is one of the central inconsistencies in plaintiff's entire case.

commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds." *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d at 799-800, citing *United States v. Bornfeld*, 145 F.3d 1123, 1135 (10th Cir. 1998); *see also Tencer*, 107 F.3d at 1135.

44.     As the amended complaint fails to demonstrate probable cause that the $7,112,971 in untainted pre-March 2011 funds in the UBS accounts "were used in some way to hide the nature of the [allegedly] tainted funds," those funds must be released.

### iv.  The government's allegations of "layering" are without merit

45.     The amended complaint alleges that Claimants did not merely commingle tainted and untainted funds, but that "this commingling [was] part of a money laundering '*layering*' scheme..." *See* Amended Complaint ¶¶ 307, 310, 313, 317 & 336 (emphasis added).   The unexplained allegation of "layering" provides further evidence that plaintiff has no basis for restraining or forfeiting Claimants' untainted pre-March 2011 funds.

46.     First, "layering" is not a crime.   The paragraphs of the complaint that allege layering contain no statutory or case citation.   Nor is the term found anywhere in the money laundering statutes, 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

47.     Where the term 'layering' *is* found is in the commentaries to the U.S. Sentencing Guidelines, which authorize a two-level sentencing enhancement for an offense involving "sophisticated laundering." U.S.S.G. § 2S1.1(b)(3) (2001).

48.     The commentary "lists four circumstances to be considered in determining whether the enhancement applies: (1) fictitious entities, (2) shell corporations, (3) layered transactions with illegitimate funds, and (4) offshore accounts." *United States v. Fernandez*, 559 F.3d 303, 320 (5th Cir. 2009); *see United States v. Miles*, 360 F.3d 472, 481-482 (5th Cir. 2005) (layering requires "complex or intricate conduct...[which] typically involves the use of...(iii) two

or more levels (i.e., layering) of transactions, transportation, transfers or transmissions, involving criminally derived funds that were intended to appear legitimate") (quoting U.S.S.G. § 2S1.1, cmt. n.5(A) (2001)).

49.     Here, the amended complaint does not allege that Claimants used "fictitious entities," "shell corporations" or "offshore accounts."   Nor does plaintiff explain how the Claimants managed to engage in "layered transactions with illegitimate funds" without the use of such typical forms of banking subterfuge.   The amended complaint merely alleges a series of legitimate banking transactions and asks the Court, without explanation or support, to infer that such transactions constituted layering.

50.     Layering is not a substitute for evidence of money laundering.   As the Court stated in  *Contents in Account No. 059-644190-69*, "the government is required to demonstrate something more than the fact of commingling, *even across a series of complicated transactions*, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds." 253 F. Supp. 2d at 799-800 (emphasis added).   Layering is a sentencing enhancement, not a criminal statute.   Thus, layering is not relevant unless the defendant has *already* been convicted of money laundering.

51.     Further, the allegations of the amended complaint do not establish the elements of layering.   To the contrary, the amended complaint itself establishes not only that Claimants had legitimate business reasons for maintaining separate accounts, but that doing so constituted best business practices.

52.     For example, as discussed above, the amended complaint acknowledges that Claimants maintained separate Wells Fargo operating accounts for each store to properly separate and track purchases and revenue.   Corporate profits were deposited into UBS business accounts, where profits were invested, and from which large capital business expenditures were

made. This separation of function between accounts and banks ensures proper accounting and tax-reporting.

53.     Further, while the amended complaint attempts to create an impression of complex transactions involving numerous accounts, the fact is that the accounts served different functions and were owned by different Claimants. The most glaring factual omission, discussed above, is that three of the UBS accounts are retirement accounts. The only way a pension fund can be funded is with corporate profits. Thus, it was not only entirely appropriate, but necessary, that transfers from corporate accounts be made to the pension accounts to comply with ERISA and the company's contractual obligations to its employees.

54.     Three other UBS accounts named in the amended complaint are not accounts at all, but are as plaintiff acknowledges, lines of credit. A line of credit obviously serves a very different function from a savings or checking account. As the amended complaint acknowledges, and as discussed more fully below, Claimants' lines of credit were used for the proper business purposes of making large capital purchases to develop and grow businesses.

55.     The remaining six UBS accounts are owned by four different Claimants: (1) one is owned by Gerald Shults; (2) one is owned jointly by Dan and Amy Herrig (husband and wife); (3) two are owned by Amy Lynn, Inc.; and (4) two are owned by Gas Pipe Inc. The amended complaint fails to establish any nefarious purpose in the maintenance of these different accounts. Indeed, apart from the retirement accounts, the amended complaint focuses largely on transfers from one Amy Lynn, Inc. account to a new Amy Lynn, Inc. 'offshoot' account in 2012, and transfers from one Gas Pipe Inc. account to a new Gas Pipe Inc. 'offshoot' account, also in 2012. In fact, as Claimants' bank records seized by plaintiff indicate, all three 'offshoot accounts' – the Amy Lynn and Gas Pipe Inc. accounts as well as the Gas Pipe Pension Dividend account – were created in 2012 for the same reason: to maximize Claimants' return on investment by

apportioning some of the balances in each main account to a more aggressive investment/dividend account.

56.     The facts of *Miles* provide an instructive contrast: the defendants were convicted of wrongfully appropriating public funds and attempting to utilize a complex series of banking transactions to hide the theft.  The Fifth Circuit affirmed the District Court's two-level increase for "sophisticated laundering."  *Miles,* 360 F.3d at 481-482.   Someone who steals public funds obviously wants to obscure any potential money trail.   The defendants' complex banking transactions were thus properly seen as attempts to accomplish that illegal purpose.

57.     Here, in contrast, the amended complaint fails to explain how Claimants' banking transactions concealed anything.   Corporate formalities were observed.   Each account bore a specific purpose and all of the transactions involving each account were consistent with that purpose.  The 'layering' allegation fails to create a money laundering claim where none exists.

58.     In sum, the amended complaint's failure to allege a valid basis for the restraint or forfeiture of Claimants' pre-March 2011 funds is not remedied by the bare allegation of 'layering.'  Those funds are untainted and did not facilitate any illegal activity.  Accordingly, the pre-March 2011 funds must be released.

**3.   Property purchased with Claimants' UBS lines of credit must be released**

59.     The amended complaint alleges that Claimants' three lines of credit with UBS are tainted.  Plaintiff's argument relies on the "limitless contagion" theory of money laundering that has been rejected by the courts and Congress, as discussed above.   It should be rejected here as well.

60.     According to the amended complaint, the alleged contagion has spread to all property purchased with funds from any of the lines of credit, regardless of the legitimacy of the use of that property.  *See* Amended Complaint ¶¶ 347-419.  Most of the defendant properties in

this category were purchased with a combination of line of credit funds and post-March 2011 funds. Claimants are not seeking the release of those properties on this motion, as the allegations raise questions of fact that must await discovery.[7]

61.     However, Claimants are seeking the release of real property and conveyances that were purchased solely with funds from the lines of credit or with a combination of such funds combined with undisputedly untainted funds. With respect to such properties, the amended complaint fails to establish probable cause for forfeiture at this stage of the proceedings.

### i.   The lines of credit are secured by untainted pre-March 2011 funds

62.     The amended complaint alleges that all three of Claimants' lines of credit with UBS are tainted: UBS #1327, owned by Amy Lynn, Inc.; UBS # 1306, owned by Gas Pipe Inc., and UBS #2323, an "offshoot" line from #1306, as discussed below. The amended complaint acknowledges, however, that all of these lines are, and always have been, secured by untainted pre-March 2011 funds. See Amended Complaint ¶ 319 (UBS #1327), ¶ 326 (UBS # 1306) & ¶ 337 (UBS #2323). Thus, the lines of credit are untainted and purchases of legitimate property made with these untainted funds cannot plausibly be alleged to have facilitated money laundering.

### UBS #1327

63.     The amended complaint acknowledges that UBS #1327 was established in October 2010, before any alleged criminal activity. UBS #1327 is a $1 million personal line of

---

[7] Property purchased with both line of credit funds and funds from Claimants' business include real property located at 3341 Winthrop Avenue and 6025 Camp Bowie Blvd in Fort Worth and two aircraft: a 1981 Cessna Conquest, and a 1996 Pilatus PC-12. *See* Amended Complaint ¶¶ 347-351, 374-380, 385-390 & 402-407. Also not challenged on this motion are properties purchased solely with line of credit proceeds but which are alleged to have been used to sell alleged Schedule I or misbranded products. *See* Amended Complaint ¶¶ 122-132 (18613 Marsh Lane), 158-167 (130 E. Bardin Road) & 168-175 (5707 Broadway Blvd). Claims to these properties require resolution of the factual and legal issues that underlie the entire proceeding.

credit for Amy Herrig.  As the amended complaint also acknowledges, UBS #1327 "is secured by margin stock" provided to UBS in October 2010, which predates any alleged criminal activity.  Amended Complaint ¶ 319.[8]

64.     Accordingly, UBS #1327 is secured by concededly untainted funds.   Any property purchased with funds from UBS #1327 that is not alleged to have been involved in any criminal activity is, therefore, untainted in both source and purpose, and must be released.

### UBS #1306

65.     The amended complaint acknowledges that UBS #1306 was established in October 2010, before any alleged criminal activity.  UBS #1306 is a business line of credit for Claimant Gas Pipe, Inc.  This line was originally in the amount of $3.5 million, until it was split in 2013, as will be discussed below.  As the amended complaint also acknowledges, UBS #1306 "is secured by margin stock" provided to UBS in October 2010, which predates any alleged criminal activity.  Amended Complaint ¶ 326.[9]

66.     Accordingly, UBS #1306 is secured by concededly untainted funds.   Any property purchased with funds from UBS #1306 that is not alleged to have been involved in any criminal activity is, therefore, untainted in both source and purpose, and must be released.

---

[8] Plaintiff asserts without evidentiary support that the UBS #1327 line of credit was secured not only by margin stock, but also by the "the value of UBS account ending in 5092."  Amended Complaint ¶ 319.  Claimant's bank records seized by plaintiff conclusively establish that this assertion is false.

[9] Plaintiff asserts without evidentiary support that the UBS #1306 line of credit was secured not only by margin stock, but also by the "the value of UBS account ending in 4596."  Amended Complaint ¶ 326.  Claimant's bank records seized by plaintiff conclusively establish that this assertion is false.

**UBS #2323**

67.     The amended complaint acknowledges that, although UBS #2323 was established in 2013, it was not a new line of credit, but an offshoot of UBS #1306, which was established in October 2010, before any alleged criminal activity.  UBS #2323 is termed "Gas Pipe personal." It was formed by splitting off $1.5 million of the $3.5 million line of UBS #1306 so that Amy Herrig could borrow additional funds for the purchase of a home while preserving separation between corporate and personal finances and accounting.

68.     With the creation of UBS #2323, the amount of the line of credit of UBS #1306 was concomitantly reduced from $3.5 million to $2 million.  This confirms that no additional security was required or provided for the opening of UBS #2323.   Thus, although UBS #2323 was opened in 2013, it "is secured by [the same] margin stock" provided to UBS in October 2010, before any alleged criminal activity.  Amended Complaint ¶ 337.[10]

69.     Accordingly, UBS #2323 is also secured by concededly untainted funds.  Any property purchased with funds from UBS #2323 that is not alleged to have been involved in any criminal activity is, therefore, untainted in both source and purpose, and must be released.

### ii.  Claimants' legitimate properties were purchased with the untainted lines of credit

70.     Paragraphs 347 through 419 of the amended complaint set forth the legal and factual grounds for the forfeiture of real property and conveyances purchased in whole or in part with funds from the UBS lines of credit described above.  With respect to the properties set forth below, plaintiff has failed to establish probable cause for forfeiture because the source of the

---

[10]Plaintiff asserts without evidentiary support that the UBS #2323 line of credit was secured not only by margin stock, but also by the "the value of UBS accounts ending in 8258 and 4596." Amended Complaint ¶ 337.  Claimant's bank records seized by plaintiff conclusively establish that this assertion is incorrect.

funds used to purchase these properties was untainted and because there is no claim that these properties were used to commit any crime for facilitate any criminal activity.  Accordingly, these properties should be released.

### 3320 Harvard Avenue, Dallas Texas

71.     The amended complaint fails to demonstrate probable cause that the real property at 3320 Harvard Avenue, Dallas Texas, is subject to forfeiture.  The amended complaint alleges that this property is subject to forfeiture because it was allegedly purchased with tainted funds and therefore was 'involved in' money laundering.  Amended Complaint ¶¶ 357-361.

72.     The real property located at 3320 Harvard Avenue is the home of Amy and Dan Herrig.  They purchased the home in 2013.  The $1.83 million purchase price was derived from two sources.  One source was $500,000 in proceeds from the sale of their prior home, which they owned long before the alleged period of criminal activity and is not alleged to be involved in any criminal activity.  Instead of taking out a mortgage for the remainder of the purchase price, Amy and Dan Herrig borrowed $1.33 million from the untainted 'offshoot' UBS line of credit, account #2323, described above.  See Amended Complaint ¶ 357.

73.     As the purchase price of 3320 Harvard Avenue was derived exclusively from untainted sources and the property is not alleged to have been used to commit any crime, the property is neither the 'proceeds of' nor 'involved in' any illegal activity.  Accordingly, there is no probable cause to restrain 3320 Harvard Avenue prior to trial. The property must therefore be released.

### 28927 S.E. Woods Road, Eagle Creek, Oregon

74.     The amended complaint fails to demonstrate probable cause that the real property at 28927 S.E. Woods Road, Eagle Creek, Oregon, is subject to forfeiture.   The amended complaint alleges that this property is subject to forfeiture because it was allegedly purchased

with tainted funds and therefore was 'involved in' money laundering.  Amended Complaint ¶¶ 352-356.

76.    The real property located at 28927 S.E. Woods Road is the second home of Amy and Dan Herrig.  They purchased the property in 2013.  The $301,000 purchase price was derived solely from UBS line of credit account #2323 (Gas Pipe personal) and UBS line of credit account #1327 (Amy Lynn, Inc.).[11]

76.    As the purchase price of 28927 S.E. Woods Road was derived exclusively from untainted sources and the property is not alleged to have been used to commit any crime, the property is neither the 'proceeds of' nor 'involved in' any illegal activity.  Accordingly, there is no probable cause to restrain 28927 S.E. Woods Road prior to trial.   The property must therefore be released.

**1951 Piper Cub PA-18 Aircraft**

77.    The amended complaint fails to demonstrate probable cause that the seized 1951 Piper Cub PA-18 aircraft is subject to forfeiture.   The amended complaint alleges that this property is subject to forfeiture because it was allegedly purchased with tainted funds and therefore was 'involved in' money laundering.  Amended Complaint ¶¶ 408-413.

78.    The 1951 Piper Cub PA-18 is the personal aircraft of Dan Herrig, who is not accused of any crime.  He purchased the aircraft in March 2012.  The amended complaint alleges that the $57,850 purchase price was derived solely from UBS line of credit account #1327 (Amy Lynn, Inc.).  Amended Complaint ¶ 409.

---

[11]The complaint asserts that the funds for the purchase of 28927 S.E. Woods Road came from UBS account #5092.  Claimant's bank records seized by plaintiff conclusively establish that this allegation is erroneous.

79.     As the purchase price of the 1951 Piper Cub PA-18 aircraft was derived exclusively from an untainted source and the property is not alleged to have been used to commit any crime, the property is neither the 'proceeds of' nor 'involved in' any illegal activity. Accordingly, there is no probable cause to restrain the 1951 Piper Cub PA-18 aircraft prior to trial.   The property must therefore be released.

### 1999 Cessna 208 Caravan Aircraft

80.     The amended complaint fails to demonstrate probable cause that the seized 1999 Cessna 208 Caravan aircraft is subject to forfeiture.   The amended complaint alleges that this property is subject to forfeiture because it was allegedly purchased with tainted funds and was therefore 'involved in' money laundering.   Amended Complaint ¶¶ 391-396.

81.     The 1999 Cessna 208 Caravan belongs to Claimant Rapids Camp Lodge, Inc., and is used for its wilderness adventure fishing business.   Neither the company nor its business is alleged to have engaged in any criminal activity.   Claimant Rapids Camp Lodge, Inc. purchased the aircraft in March 2012.   The amended complaint alleges that the $945,000 purchase price was derived solely from UBS line of credit account #1306 (Gas Pipe Inc.).   Amended Complaint ¶ 392.

82.     As the purchase price of the 1999 Cessna 208 Caravan aircraft was derived exclusively from an untainted source and the property is not alleged to have been used to commit any crime, the property is neither the 'proceeds of' nor 'involved in' any illegal activity. Accordingly, there is no probable cause to restrain the 1999 Cessna 208 aircraft prior to trial. The property must therefore be released.

### 1978 Delta Marine Fishing Boat, "Sea Witch"

83.     The amended complaint fails to demonstrate probable cause that the 1978 Delta Marine Fishing Boat, "Sea Witch," is subject to forfeiture.   The amended complaint alleges that

this property is subject to forfeiture because it was allegedly purchased with tainted funds and was therefore 'involved in' money laundering.  Amended Complaint ¶¶ 414-419.

84.    "Sea Witch" belongs to Claimant Rapids Camp Lodge, Inc., and is used for its wilderness adventure fishing business.  Neither the company nor its business is alleged to have engaged in any criminal activity.  Claimant Rapids Camp Lodge, Inc. purchased the vessel in May 2012.  The amended complaint alleges that this property was purchased with $270,000 from UBS line of credit account #1306 (Gas Pipe Inc.). Amended Complaint ¶ 415.

85.    As the purchase price of the 1978 Delta Marine Fishing Boat "Sea Witch" was derived exclusively from an untainted source and the property is not alleged to have been used to commit any crime, the property is neither the 'proceeds of' nor 'involved in' any illegal activity. Accordingly, there is no probable cause to restrain the 1978 Delta Marine Fishing Boat "Sea Witch" prior to trial.   The property must therefore be released.

## V.  Prayer

Claimants respectfully pray that the Court grant this opposed joint motion to compel the release of restrained or seized property for which the government has failed to demonstrate probable cause for forfeiture, and order the immediate release and return of the following property:

(1) Two UBS accounts that are ERISA-qualified employee pension accounts and one personal IRA as follows: UBS #8402 (GP Pension Fund); UBS #4875 (GP Pension Dividend); and UBS #0852 (Gerald Shults IRA);

(2) Funds that were in the UBS accounts prior to March 1, 2011, which are: UBS #5092 (March 1, 2011 balance $1,237,000); UBS #8258 (March 1, 2011 balance $5,542,406); and UBS #6235 (March 1, 2011 balance $333,565), the combined balances as of March 1, 2011 being **$7,112,971**; and

(3) Real and personal property purchased with Claimants' UBS lines of credit, which are property purchased with funds from UBS #1327, UBS #1306, and UBS #2323 as follows: 3320 Harvard Avenue, Dallas Texas; 28927 S.E. Woods Road, Eagle Creek, Oregon; the 1951 Piper Cub PA-18 Aircraft; the 1999 Cessna 208 Caravan Aircraft; and the 1978 Delta Marine Fishing Boat, "Sea Witch."

Respectfully submitted,

David L. Botsford
1307 West Avenue
Austin, Texas 78701
Phone: 512-479-8030
Fax: 512-479-8030
dbotsford@aol.com
Texas Bar No. 02687950
Attorney for Claimants Amy Lynn Herrig
and Dan Herrig, Individually

George R. Milner, III
Milner Finn Price
2828 N. Harwood St. Suite 1950
Dallas, Texas 75201
Phone: 214-651-1121
Fax: 214-953-1366
ItsRainingII@aol.com
Texas Bar No. 00784611
Attorney for Claimants Gerald Shults, individually
and on behalf of Amy Lynn, Inc., Gas Pipe, Inc.,
Ridglea Complex Management Inc., and Rapids
Camp Lodge, Inc.

Michael Mowla
445 E. FM 1382 No. 3-718
Cedar Hill, Texas 75104
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Claimants Gerald Shults, individually
and on behalf of Amy Lynn, Inc., Gas Pipe, Inc.,
Ridglea Complex Management Inc., and Rapids
Camp Lodge, Inc.

**/s/ Michael Mowla**
By: Michael Mowla

## VI. Certificate of Conference

I certify that on January 20, 2015, we conferenced with AUSA Poe regarding the tax motion (ECF 108), who indicated that the government opposes the requested relief in that motion. Then on March 22 and 23, 2015, we conferenced with AUSA Poe regarding the motion to release aircraft and boat, who again indicated that the government opposes the requested relief that motion. Because this motion requests similar relief and the government has opposed all prior similar requested relief, this motion is filed as opposed.

**/s/ Michael Mowla**
By: Michael Mowla

## VII.      Certificate of Service

This is to certify that on May 10, 2015, this document was filed with the Clerk of the Court using the ECF system, which automatically sends notice of electronic filing to the attorneys of record who have consented to accept such notice.

**/s/ Michael Mowla**
By: Michael Mowla